UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
CHRISTOPHER D. GRIFFITH and DAVID
SPECIALE, on behalf of themselves and all      Index No: 12-cv-1117 (PAC)
others similarly situated,

            Plaintiffs,

v.

FORDHAM FINANCIAL MANAGEMENT,
INC. and WILLIAM BAQUET,

           Defendants.
-----------------------------------------------------------x

### DECLARATION OF CHRISTOPHER D. GRIFFITH

I, Christopher D. Griffith, under penalty of perjury, affirm as follows:

1.    I submit this declaration based on personal knowledge unless indicated otherwise.

2.    I was employed by Fordham Financial Inc. ("Fordham") as a stockbroker from approximately January 2008 until November 2011. I worked at Fordham's office located in New York, New York.

3.    Fordham is a full-service brokerage firm which provides financial services including, but not limited to, investment banking.

4.    Fordham did not require that stockbrokers have any specialized training or degree. Indeed, stockbrokers were not even required to have a college degree. Rather, Fordham only required that all stockbrokers possess entry-level licenses, which are obtained by taking examinations. (For example, the Series 7 and Series 63.)

5. Stockbrokers at Fordham were provided with a telephone, a computer (once brokers started generating commissions), and business cards identifying them as Fordham brokers.

6. As a stockbroker, my primary duty at Fordham was to sell financial products. It was my job – and the job of the other stockbrokers at Fordham – to sell clients stocks and various other financial products.

7. Stockbrokers' daily job duties included: researching stocks and reading company reports, writing tickets, getting trades approved, going to company meetings; working on our book of business; preparing for calls with clients and potential clients (including by putting together sales pitches), calling clients, emailing clients, meeting with clients, and cold calling potential clients. ("Cold calling" means mass dialing potential clients to try to get new clients.)

8. Fordham required the stockbroker to write up contemporaneous notes for our communications with clients.

9. Fordham required all stockbrokers to be working at Fordham's office during set hours.

10. Mondays through Fridays, Fordham required all stockbrokers to be in the office by 8:30 a.m. (It was "suggested" that we arrive by 8:00 a.m.)

11. At 8:30 a.m., Fordham conducted a mandatory meeting. If you were late for the meeting, you would either be fined or sent home for the day.

12. Once, I was sent home for the day for being approximately five minutes late to the morning meeting. Further, on at least one other occasion, I was fined for being late to the morning meeting.

13. Based upon my observations and experiences working for Fordham, and conversations with other stockbrokers, I also know that other stockbrokers were sent home and/or fined for being late.

14. On Mondays through Thursdays, Fordham required brokers to be in the office a minimum of ten (10) hours. (It was regularly "suggested" that stockbrokers should work twelve (12) hours.)

15. On Fridays, brokers were allowed to leave the office at 4:00 p.m.

16. I was disciplined for leaving work early.

17. Based upon my observations and experiences working for Fordham, and conversations with other stockbrokers, I also know that other stockbrokers were disciplined for leaving early.

18. Fordham terminated stockbrokers for failing to come in to work.

19. Fordham supervised my work, and they reviewed, processed and approved trades that stockbrokers performed.

20. Fordham had a sales/branch manager who acted as stockbrokers' direct supervisor.

21. Stockbrokers were not permitted to work for other employers unless we were given prior written permission.

22. At the time of hire, Fordham required stockbrokers to be finger printed and have a background check.

23. Fordham had a dress code and required all stockbrokers to wear "business attire."

24. Stockbrokers would be terminated if Fordham did not think they were bringing in sufficient business to the company.

25. All customer accounts opened by myself and other stock brokers were the property of Fordham and Fordham retained the account if a broker was terminated or left voluntary.

26. Stockbrokers were never guaranteed a salary of $455 per week.

27. During the first few months of Fordham stockbrokers' employment (when the stockbrokers have opened few – if any – new accounts), they are paid a small amount of money (approximately $1,200 per month); however, even this small amount is not guaranteed. Fordham represented that they could seek the recovery of this money if a stockbroker left before generating sufficient business.

28. After opening thirty new accounts, or working for approximately for approximately three months, Fordham stockbrokers were paid solely based upon their commissions.

29. If I sold financial products, I would receive a percentage of my sales revenue. If I sold little or no financial products, I would receive little or no compensation for the month. As a result of this arrangement, I regularly made significantly less than the minimum wage.

30. Based upon my observations and experiences working for Fordham, knowledge of the company's compensation structure, and conversations with other stockbrokers, I know that the other stockbrokers were compensated in the same manner.

31. As a stockbroker for Fordham, I typically worked at least fifty (50) hours per week (and often times more). For each day of the work week, I typically arrived to work between 8:00 a.m. and 8:30 a.m. Monday through Thursday, I regularly stayed past 6:30 p.m. On Friday, I typically stayed until 4:00 p.m.

32. Based upon my observations and experiences working for Fordham and conversations with other stockbrokers, I know that the other stockbrokers also regularly worked more than forty (40) hours per week. (As discussed above, Fordham actually required stockbrokers to be in the office working over forty (40) hours per week.)

33. During my employment with Fordham, I was not paid overtime compensation (one-and-one-half times my regular rate) for hours that I worked in excess of forty (40) in a workweek. I did not receive any additional compensation for working over forty hours in a week.

34. Based upon my observations and experiences working for Fordham, knowledge of the company's compensation structure, and conversations with other stockbrokers, I know that the other brokers were not paid overtime compensation (one-and-one-half times their regular rate) for hours that they worked in excess of forty (40) in a workweek. Like me, the other stockbrokers did not receive any additional compensation for working over forty hours in a week.

35. To the best of my knowledge, Fordham did not record the hours that I or any other stockbroker worked per week.

36. Fordham also offered stockbrokers the option of getting medical insurance through Fordham.

37. Fordham took taxes out of my compensation and reported my earnings on a W-2.

   I declare, under penalty of perjury, that the above and foregoing information is true and correct.

Dated: December 10, 2012

                _____
                Christopher D. Griffith