UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

CHRISTOPHER D. GRIFFITH and DAVID                 :
SPECIALE, on behalf of themselves and all others  :
similarly situated,                                :
                                                   :
            Plaintiffs,                            :
                                                   :
      -against-                                    :
                                                   :     12 Civ. 1117 (PAC)
FORDHAM FINANCIAL MANAGEMENT, INC.  :
and WILLIAM BAQUET,                                :
                                                   :     **OPINION & ORDER**
            Defendants                             :

------------------------------------------------------------- x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:   3 - 12 - 15

HONORABLE PAUL A. CROTTY, United States District Judge:

On February 14, 2012, Plaintiffs Christopher Griffith and David Speciale filed a complaint against their former employer, Fordham Financial Management, Inc. ("Fordham"), and William Baquet, Fordham's president and chief executive officer, alleging violations of the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL"). Plaintiffs claim that they were not paid minimum wage; that they were not paid time and a half for work in excess of forty hours per week; that they were not paid in a timely manner; and that improper deductions were made from their wages. On May 22, 2013, the Court granted Plaintiffs' motion for conditional certification of a collective action under the FLSA.[1]

Plaintiffs now move for class certification, pursuant to Fed. R. Civ. P. 23, with respect to their NYLL claims.

Plaintiffs' motion is DENIED. They have failed to establish either commonality or

---

[1] In addition to Griffith and Speciale, five Plaintiffs have opted into the FLSA collective action: Alonzo Adams, Francois Ricardo, Mack Miller, Daniel DeKleine, and Paul Calabrese (together, "Plaintiffs"). All are former employees.

1

preponderance as required by Fed. R. Civ. P. 23(a) and (b).

## BACKGROUND

Fordham is a brokerage firm that provides financial services, including investment banking. Griffith Decl. ¶ 3. At Fordham, the individuals who sell stocks and other financial products to clients are stockbrokers and trainee brokers, referred to as "cold-callers." *Id.* ¶ 8; Suess Decl., Ex. V (Speciale Tr.), at 23, 26. Stockbrokers do not receive a salary, but are paid by commissions for their sales of financial products. Griffith Decl. ¶¶ 30-31. Cold-callers, on the other hand, receive a salary of $60 per day. Suess Decl., Ex. N (Adams Tr.), at 23; Baquet Decl. ¶ 15. Some cold-callers enter into side arrangements with stockbrokers to solicit clients on the stockbrokers' behalf, in exchange for a percentage of commissions arising from a sale. Adams Tr. 23, Baquet Decl. ¶ 15. After cold-callers open a certain number of accounts, they become stockbrokers and begin working on a commission basis. Baquet Decl. ¶ 15. Stockbrokers and cold-callers (together, "Potential Class Members") do not receive overtime wages for hours worked in excess of forty per week, nor are they paid at or above a minimum wage. *See, e.g.*, McClintock Decl. ¶¶ 30, 34-35. Fordham also deducts a variety of expenses from their paychecks, including ticket and sales assistant charges, state registration fees advanced by Fordham, and Federal Express fees. *Id.* ¶ 34; Baquet Decl. ¶ 12.

According to Plaintiffs, Potential Class Members are employees who are required to be in the office for a minimum of ten hours per day. *See, e.g.*, Speciale Decl. ¶ 15; Suess Decl., Ex. Q (Griffith Tr.), at 24. They must attend a mandatory 8:30 a.m. meeting every day, and tardiness is subject to punishment. *See, e.g.*, McClintock Decl. ¶ 11; Griffith Tr. 98. In addition, Fordham reports Potential Class Members' income on W-2 tax forms and enters into "employment agreements" with them. *See, e.g.*, Griffith Decl. ¶ 39; Baquet Decl., Ex. C. The

2

named Plaintiffs and Potential Class Members seek minimum wages and overtime, and they object to unauthorized deductions.

Defendants dispute Plaintiffs' allegations, contending that Potential Class Members are independent contractors, not employees, and the NYLL therefore does not apply to them. They are free to set their own hours, and the morning meeting, which does not occur daily, is optional. *See, e.g.*, Baquet Decl. ¶¶ 6-7. Defendants also state that while some Potential Class Members enter into "employment agreements," others have different contracts, or no contract at all. Baquet Decl. ¶¶ 9, 16. Defendants also argue that individualized assessments are necessary to determine employment status.

## DISCUSSION

### I.    Legal Standard

In considering "whether class certification is appropriate, a district court must first ascertain whether [plaintiffs'] claims meet the preconditions of Rule 23(a)." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201 (2d Cir. 2008). Rule 23(a) requires plaintiffs to demonstrate that:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). In addition, Plaintiffs must show that certification is appropriate under Rule 23(b). To do so, Plaintiffs may demonstrate that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

3

Since Plaintiffs are seeking class certification, they bear "the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010).  In determining whether plaintiffs have met that burden, courts must "resolve factual disputes relevant to each Rule 23 requirement" by conducting a "rigorous analysis." *In re Am. Int'l Group Secs. Litig.*, 689 F.3d 229, 238 (2d Cir. 2012) (citations omitted).  Though that analysis may "entail some overlap with the merits of the plaintiff's underlying claim," a court may not engage in "free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013) (citations omitted).  Instead, merits questions "may be considered . . . only to the extent[] that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 1195.

## II.    Analysis

Defendants oppose class certification because Plaintiffs have not established either commonality (Rule 23(a)) or preponderance (Rule 23(b)).  The Court agrees.

### A. Commonality

Commonality requires that plaintiffs' claims "depend upon a common contention" that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  The issue is not whether "common questions exist, but rather "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id* (citations omitted).

The NYLL covers employees, but does not apply to independent contractors. *See Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 911 (S.D.N.Y. 2013).   In cases where plaintiffs

4

claim that defendants have misclassified potential class members as independent contractors, rather than employees, commonality is satisfied if the plaintiffs' employment status is "a common question capable of being answered through classwide proof." *Ouedraogo v. A-1 Int'l Courier Serv., Inc.*, 2014 U.S. Dist. LEXIS 132156, at *10-11 (S.D.N.Y. Sept. 18, 2014).

Under the NYLL, the "the critical inquiry in determining whether an employment relationship exists pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results." *Bynog v. Cipriani Group, Inc.*, 1 N.Y.3d 193, 198 (2003). Relevant factors include "whether the worker (1) worked at his own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll and (5) was on a fixed schedule." *Id.* A plaintiff's tax status, while probative, is not determinative. *See Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988); *cf. Landaeta v. N.Y. & Presbyterian Hosp.*, 2014 U.S. Dist. LEXIS 27677, at *14 (Mar. 4, 2014) ("Plaintiffs' tax filings are plainly relevant to the independent contractor versus employee inquiries . . . but they do not preempt the inquiries altogether."). Also relevant is the manner in which an individual is compensated: salary- and hourly-based wages are generally indicative of an employee relationship, while commission-based wages weigh in favor of an independent contractor relationship. *See Frishberg v. Esprit de Corp*, 778 F. Supp. 793, 799 (S.D.N.Y. 1991); *Deboissiere v. Am. Modification Agency*, 2010 U.S. Dist. LEXIS 113776, at * 7 (E.D.N.Y. 2010).

Here, Plaintiffs have failed to demonstrate by a preponderance of the evidence that Potential Class Members' employment status is capable of classwide proof. In support of their argument that all Potential Class Members are employees, Plaintiffs claim that they did not work at their own convenience, but instead worked on a fixed schedule set by Defendants. In

5

particular, Plaintiffs assert that they were required to work from 8:00 a.m. to 6:00 p.m. from Monday through Thursday, and from 8:00 a.m. to 4:00 p.m. on Fridays.[2] *See, e.g.*, Adams Tr. 18; Speciale Decl. ¶¶ 12-13, 15-16.

Plaintiffs' deposition testimony reflects that Plaintiffs were generally in the office during those times; however, there does not appear to be a particular fixed schedule applicable to all stockbrokers. *See, e.g.*, Suess Decl., Ex. P (Calabrese Tr.), at 62-65 (arrived at 5:30 a.m. 2-3 days per week and 7:50 a.m. the rest of the week; left between 8:00 p.m. and 9:00 p.m); *Id.*, Ex. T (Miller Tr.), at 54 (worked from 7:30 a.m. to 9:00 p.m. Mondays through Thursdays and 7:30 a.m. to 4:00 p.m. on Fridays); Speciale Tr. 57 (worked from 8:00 a.m. to 6:30 p.m.); Adams Decl. ¶ 28 (worked from 7:30 a.m to 7:00 p.m.); McClintock Decl. ¶ 28 (worked from 7:30 a.m. to 8:00 p.m. Mondays through Thursdays, and 7:30 a.m. to 6:00 p.m. on Fridays).  Importantly, some Plaintiffs indicated that they did not attend work at all on certain days. *See, e.g.*, Miller Tr. 61-62 (would "not come in" on Fridays approximately every six weeks); Speciale Tr. at 53 (attended work "just about every day" but took some Fridays off); Griffith Tr. at 113 (in addition to a one-week vacation and a three-week recovery from surgery, took "a long weekend here or there"); *id.* at 114 (vacations that brokers took "varied . . . . [s]ome brokers took none, and some took . . . a few").  The admitted variability in Plaintiffs' work schedules dictates individualized inquiry to determine the hours that Potential Class Members work, and whether they do so at their own convenience or pursuant to a fixed schedule.

In addition, the method of compensation varies among Potential Class Members.[3] Stockbrokers are compensated based solely on commissions, weighing in favor of an

---

[2] Defendants dispute these points.  A number of declarations submitted by Defendants state that there are no mandatory hours for stockbrokers, and that Plaintiffs did not regularly work 48 hours per week. *See, e.g.*, Suess Decl., Ex. EE (Conroy Decl.), at ¶ 4.

independent contractor relationship.  Griffith Decl. ¶¶ 30-31; *see Frishberg*, 778 F. Supp. at 799.

In contrast, cold callers are paid $60 per day, suggesting an employee relationship.  Baquet Decl.

¶ 15; *see Frishberg*, 778 F. Supp. at 799.  But cold-calling is really broker training.  Further,

some cold-callers earn both a percentage of commissions and a daily salary.  Baquet Decl. ¶ 15.

Moreover, during the putative class period, some Potential Class Members worked as both cold-

callers and brokers, others worked only as cold-callers, and still others worked only as brokers.[4]

Plaintiffs also assert that "Defendants entered into '*employee contracts*'—not

independent contractor agreements—with stockbrokers."  Mtn. at 11.  The existence of

"employee contracts" is clearly probative.  Yet not all Potential Class Members signed such

contracts.  The record indicates that some Plaintiffs signed documents titled "Employment

Agreements," while others signed entirely different—and less comprehensive—agreements titled

"Agreement Between Fordham [] and Broker/Trainee."[5]  *See* Baquet Decl., Ex. B, C, C-1, H, I, J.

At least one Plaintiff does not appear to have any written agreement.  *See* Opp. Mtn. at 13.

The Court would be required to make an individualized inquiry regarding what, if any,

type of agreement each Potential Class Member signed to help answer the question of

employment status.

---

[3] Defendants do not contest that they report Potential Class Members' income on W-2 tax forms.  While this is relevant to the inquiry, it does not "preempt [it] altogether."  *Cf. Landaeta*, 2014 U.S. Dist. LEXIS 27677, at *14.

[4] For example, Griffith and Calabrese began working as cold-callers, but eventually became brokers.  Griffith Tr. 26-27; Calabrese Tr. 55.  Adams worked only as a cold-caller; Miller worked only as a broker.  Adams Tr. at 47; Miller Tr. at 14.

[5] There does not appear to be a correlation between Plaintiffs' job titles and their written agreements.  For example, although Griffith and Calabrese both began as cold-callers and subsequently became brokers, Griffith signed an "Employment Agreement," while Calabrese signed a "Broker/Trainee" agreement.  *See* Baquet Decl. B, I.

In assessing Plaintiffs' claim that Fordham made unauthorized deductions from their wages, some of the signed "Employment Agreements" affirmatively agreed to specified deductions. *See* Baquet Decl., Ex. B, C, C-1. This too would require an individual assessment of which Potential Class Members agreed to deductions, and what those deductions were.

Moreover, the terms of the "Employment Agreements" appear to have been inconsistently enforced among Potential Class Members who signed them. For example, the Employment Agreement appears to prohibit stockbrokers from taking clients with them when they leave Fordham. *See, e.g.*, Baquet Decl., Ex. B ¶ 6. Plaintiffs' declarations indicate that Defendants generally enforced this provision. *See, e.g.*, Miller Decl. ¶ 20 ("All customer accounts opened by myself and other stock brokers were the property of Fordham and Fordham retained the account if a broker was terminated or left voluntarily."). Griffith testified, however, that when he left Fordham, he took approximately 50 percent of his clients with him to his new employer.[6] Griffith Tr. at 69.

Finally, Plaintiffs' testimony indicates substantial disagreement regarding the level of control Defendants exercise over Potential Class Members' day-to-day responsibilities. For example, Speciale testified that, for each trade, he was required to seek Fordham's prior approval in recommending stock to clients. Suess Decl., Ex. O, (Speciale Tr. II), at 43. Similarly, Adams testified that Fordham determined whether stocks were suitable for customers. Adams Tr. 37. On the other hand, Griffith testified that he "was in full control of bringing the client ideas and soliciting them . . . to purchase more financial product from us." Griffith Tr. 52. Miller likewise testified that the management of customer accounts was within his discretion. Miller Tr. 45.

---

[6] Griffith's testimony contradicts the statement in his declaration that all customer accounts belonged to Fordham, and that Fordham retained stockbrokers' accounts after they left the company. *See* Griffith Decl. ¶ 27.

Calabrese and Griffith testified that they, not Fordham, determined whether investments were suitable for customers. Calabrese Tr. 52-53; Griffith Tr. 58-59.

These substantial disagreements on this key issue of Fordham's control indicates that a classwide determination of Potential Class Members' employment status is not appropriate.[7] Accordingly, Plaintiffs have failed to establish commonality.

### B. Predominance

The predominance requirement "is a more demanding criterion than the commonality inquiry under Rule 23(a)." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002). Class-wide issues predominate if "resolution of some of the legal or factual questions . . . can be achieved through generalized proof," and those issues are "more substantial than the issues subject only to individualized proof." *Id.*

Even if Plaintiffs were able to demonstrate commonality, they have failed to establish by a preponderance of the evidence that class-wide issues predominate over individual issues. In addition to individual issues regarding Potential Class Members' employment status, Plaintiffs have not established that their damages theory can accurately calculate damages on a class-wide basis.

Plaintiffs intend to "prove damages through (1) representative testimony that Defendants required class members to work at least 48 hours per week and (2) Defendants' payroll records." Reply Mtn., at 7. Plaintiffs correctly note that the Supreme Court's decision in *Comcast Corp. v.*

---

[7] The record indicates that two factors relevant to employment status are capable of classwide proof: whether potential class members are free to engage in other employment and whether they receive fringe benefits. *See Bynog*, 1 N.Y.3d at 198. The parties appear to agree that all Potential Class Members are able "to engage in outside employment" to the extent permitted by FINRA regulations, and that no brokers receive fringe benefits other than the option to participate at their own expense in FFM's 401K plan and health insurance plan. Opp. Mtn. at 7. These policies apply equally to all Potential Class Members, and so they can be determined by classwide proof. These two factors, however, do not establish commonality.

*Behrend* does not necessarily prohibit damages based on representative testimony. 133 S. Ct. 1426 (2013); *see Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 168 (S.D.N.Y. Mar. 19, 2014). But for the reasons set forth above, Plaintiffs have not sufficiently established that all Potential Class Members are required to—and do—work 48 hours per week. *See Reich v. S. New Eng. Telecomms. Corp.*, 121 F.3d 58, 66-67 (2d Cir. 1997) ("[A]n employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.") (citation omitted).

Some Plaintiffs testified that they did not work 48 hours every week. *See* Miller Tr. 61-62; Speciale Tr. 53; Griffith Tr. 113-114. Others testified that they regularly worked more than 48 hours per week. *See* Calabrese Tr. at 62-65. Calculating damages based on a 48-hour per week workweek would therefore overcompensate some class members and undercompensate others, without a basis for the number of hours class members actually worked.

## CONCLUSION

The Court finds that Plaintiffs have failed to establish predominance and commonality. Further analysis of the Rule 23 requirements is unnecessary. Plaintiffs' motion for class certification is DENIED. This ruling moots Plaintiffs' motion to appoint Class Counsel and Class Representatives.

Dated: New York, New York          SO ORDERED
       March 12, 2015

_____
PAUL A. CROTTY
United States District Judge