UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

CHRISTOPHER D. GRIFFITH and DAVID SPECIALE et al.,

Plaintiffs,

- against -

FORDHAM FINANCIAL MANAGEMENT, INC. And WILLIAM BAQUET,

Defendants.

-----------------------------------------------------------X

Civil Action No. 12 civ 1117

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS FORDHAM FINANCIAL MANAGEMENT, INC.'S AND WILLIAM BAQUET'S MOTION FOR SUMMARY JUDGMENT TO DECERTIFY THE COLLECTIVE ACTION CLASS**

---

Schrader & Schoenberg, LLP
Attorneys for Defendants
711 Third Avenue, Suite 1803
New York, New York 10017
(212) 986-4888

On the Brief: Benjamin Suess, Esq.

# TABLE OF CONTENTS


Page

STATEMENT OF FACTS.......................................................................1

ARGUMENT.....................................................................................1

I. CERTAIN FLSA AND NYLL CLAIMS ARE BARRED BASED UPON ADMISSIONS .......................................................1

II. THE FLSA CLAIMS OF SPECIALE, MILLER, FRANCOIS & CALABRESE ARE BARRED BY THE STATUTE OF LIMITATIONS ..............................3

III. THE CLASS MEMBERS ARE NOT SIMILARLY SITUATED .....................4

IV. THE CLASS MEMBERS ARE INDEPENDENT CONTRACTORS ..............................................13

A. Compensation from Commissions Indicates an Independent Contractor.....17

B. Autonomy Over One's Business Indicates an Independent Contractor................18

C. Ensuring Compliance with Laws, Rules and Regulations Is not Indicative of Control Over an Employee........................................19

D. A License to Conduct Business Indicates an Independent Contractor................20

V. THE CLASS SHOULD BE DECERTIFIED BECAUSE THE CLASS MEMBERS' TESTIMONIES THEMSELVES ARE CONTRADICTORY AND NOT CREDIBLE ...........................................21

VI. THE EMAIL RECORDS DEFINITIVELY ESTABLISH THAT THE OPT-IN MEMBERS DID NOT WORK OVERTIME OR FATALLY BELIES THEIR CREDIBILITY ............................................24

VII. THE OPT-IN PLAINTIFFS HAVE NOT ASSERTED ANY STATE LAW CLAIMS IN THEIR INDIVIDUAL CAPACITIES ...........25

CONCLUSION...................................................................................26

## TABLE OF AUTHORITIES

**Cases** **Page**

Albritton v. Cagles, Inc., 508 F.3d 1012 (11th Cir. 2007)....................................26

Arena v. Delux Transp. Services, Inc., 3 F.Supp.3d 1, (E.D.N.Y. 2014)....................17

Brock v. Superior Care, Inc., 840 F.2d 1054 (2d Cir. 1988)................................14

Browning v. Ceva Freight, LLC, 885 F.Supp.2d 590 (E.D.N.Y. 2012)......................18

Camesi v. University of Pittsburgh Medical Center, 2011 WL 6372873 (W.D.Pa. 2011)....................................................14

Cohen v. Laiti, 98 F.R.D. 581 (E.D.N.Y. 1983)...............................................21

Darvin v. International Harvester Co., 610 F.Supp. 255 (S.D.N.Y. 1985)..................21

Desimone v Allstate Ins., 2000 WL 1811385 (N.D.Cal. 2000)..............................18, 20

Doo Nam Yang v. ACBL Corp., 427 F. Supp. 2d 327 (S.D.N.Y. 2005)....................3

Evans v. MassMutual Financial Group, 856 F.Supp.2d 606 (W.D.N.Y. 2012).............17

Lamson v. EMS Energy Marketing Service, Inc., 868 F.Supp.2d 804 (E.D.Wis. 2012)...17, 18

Lee v. ABC Carpet & Home, 236 F.R.D. 193 (S.D.N.Y. 2006).............................3, 5

McLaughlin v. Richland Shoe Co., 486 U.S. 128 (1988)....................................3

Ruiz v. Citibank, N.A., --- F.Supp.3d ----, 2015 WL 1254820 (S.D.N.Y. 2015)...........4

Saleem v. Corporate Ground Transportation Group, Ltd., 12-CV-8450 (JMF), 2014 WL 7106442 (December 9, 2014)................................26

Schweiger v. Farm Bureau Ins. Co., 207 F.3d 480 (8th Cir. 2000)..........................18, 20

Schwind v. EW & Associates, Inc., 357 F. Supp.2d 691 (S.D.N.Y 2005)...................13

Shayler v. Midtown Investigations, Ltd., 2013 WL 772818 (S.D.N.Y. 2013)..............13-14

Smith-Johnson v. Thrivent Financial for Lutherans, 2005 WL 1705471 (M.D.Fla. 2005)...................................................18, 20-21

Spellman v. American Eagle Exp., Inc., 2013 WL 1010444 (E.D.Pa. 2013)................14, 15

Tracy v. NVR, Inc., 293 F.R.D. 395 (W.D.N.Y. 2013)....................................10

Velu v. Velocity Express, Inc., 666 F.Supp.2d 300 (E.D.N.Y. 2009)........................18

Virga v. Big Apple Const. & Restoration Inc., 590 F. Supp. 2d 467 (S.D.N.Y. 2008)......1

Walker v. Bankers Life & Cas. Co., 2008 WL 2883614 (N.D. Ill. 2008)..................17, 18, 20

Zivali v. AT & T Mobility, LLC, 784 F.Supp.2d 456 (S.D.N.Y. 2011).....................10

**Statutes & Rules**

29 U.S.C. § 255..........................................................................3

29 U.S.C. § 256..........................................................................3

FRCP 36(a)(3)............................................................................1

Defendants Fordham Financial Management, Inc. ("FFM") and William Baquet ("Baquet" and FFM are the "defendants") submit this memorandum of law in support of their motion for summary judgment and to decertify the collective action class comprised of Christopher Griffith ("Griffith"), David Speciale ("Speciale"), Mack Miller ("Miller"), Ricardo Francois ("Francois"), Alonso Adams ("Adams") and Paul Calabrese ("Calabrese", collectively the "Class Members") asserting claims under 29 USC § 216(b) of the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL").[1]

## STATEMENT OF FACTS

For purposes of brevity, the Court is respectfully referred to the accompanying Declarations of William Baquet ("Baquet Dec."), Phyllis Henderson ("Henderson Dec. III") and Benjamin Suess each dated July 13, 2015 ("Suess Dec."), as well as this Court's prior March 12, 2015 Decision Denying Plaintiffs' Rule 23 Class Certification (Suess Dec. Ex. J).

## ARGUMENT

### I. CERTAIN FLSA AND NYLL CLAIMS ARE BARRED BASED UPON ADMISSIONS

Several claims are barred based upon admitted facts. It is well settled that pursuant to FRCP 36(a)(3), a party is deemed to have all "statements or opinions of fact, or application of law to fact" in a notice to admit if no response is provided within 30 days of service. Virga v. Big Apple Const. & Restoration Inc., 590 F. Supp. 2d 467, 471 (2008) citing FRCP 36(a)(3). "The Second Circuit permits admissions under to rule 36(a) to be used for summary judgment." Id. (citation omitted). Griffith and Miller failed to respond to defendants' First Notice to Admit and

[1] On May 26, 2015, the Estate of Daniel DeKleine ("DeKleine") withdrew its consent to sue. Suess Dec. ¶ 1; Ex. I (DeKleine withdrawal notice).

all Opt-In Plaintiffs failed to respond to the defendants' Second Notice to Admit.[2] As a threshold matter, based admissions made, several claims should be barred.

a. FLSA and NYSL Minimum Wage Claims for Griffith and Miller are Barred. Griffith and Miller admitted they had no set hours; were "Commissioned Employees" not subject to set hours; set their own hours of attendance; worked between 9:30 a.m. and 4:30 p.m.; did not work more than 40 hours per week and were not required to do so; did not work weekends; if they did work more than 40 hours per week or weekends, it was without request and without the knowledge or approval of their supervisors; and their income for all hours they worked met or exceeded the minimum wage required under the FLSA and NYLL. Suess Dec. Ex. K (Griffith NTA) at 14, 21, 22, 25, 26, 28-31, 33-35; Ex. PP (Miller NTA) at 14, 20, 21, 24, 25, 27, 31-33, 35-38; Ex. TT (Griffith NTA 2) at 8; Ex. VV (Miller NTA 2) at 8.

b. NYLL Minimum Wage Claims for Speciale, Calabrese and Adams are Barred. Speciale, Calabrese and Adams admitted that their income for all hours they worked met or exceeded the minimum wage required under the NYLL. Suess Dec. Ex. UU (Speciale NTA 2) at 8; Ex. XX (Calabrese NTA 2) at 8; Ex. YY (Adams NTA 2) at 11.

c. NYLL Claims for Francois are Barred. Francois admitted that his NYLL claim is time barred under the applicable statute of limitation. Suess Dec Ex WW (Francois NTA 2) at 5.

d. Francois' Claims Under the FLSA are Barred by Attorney Admissions. Pursuant to email from plaintiff's counsel, Matthew Kadushin on January 23, 2014, plaintiff admitted that

---

[2] See Suess Dec. Ex. S [Speciale's Responses to First Notice to Admit ("Speciale NTA")]; Ex. K [First Notice to Admit to Christopher Griffith ("Griffith NTA")]; Ex. PP [First Notice to Admit to Mack Miller ("Miller NTA")]; Ex. SS [Adams' Responses to First Notice to Admit ("Adams NTA")]; Ex. RR [Calabrese's Responses to First Notice to Admit ("Calabrese NTA")]; Ex. QQ [Francois' Responses to First Notice to Admit ("Francois NTA")]; Ex. UU [Second Notice to Admit to David Speciale ("Speciale NTA II")]; Ex. TT [Second Notice to Admit to Christopher Griffith ("Griffith NTA II")]; Ex. VV [Second Notice to Admit to Mack Miller ("Miller NTA II")]; Ex. YY [Second Notice to Admit to Alonso Adams ("Adams NTA II")]; Ex. XX [Second Notice to Admit to Paul Calabrese ("Calabrese NTA II")]; Ex. WW [Second Notice to Admit to Ricardo Francois ("Francois NTA II")].

Francois had no valid FLSA claims. Suess Dec. Ex. BBB (January 23, 2014 email).

## II. THE FLSA CLAIMS OF SPECIALE, MILLER, FRANCOIS & CALABRESE ARE BARRED BY THE STATUTE OF LIMITATIONS

FLSA claims of Speciale, Miller, Francois and Calabrese are barred by the statute of limitations. The statute of limitations under the FLSA is 2 years from accrual, unless a plaintiff demonstrates that the violation was willful, for which a 3-year statute of limitations applies. 29 U.S.C. § 255. To be willful, the employer must have "either [known] or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]." McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988). For purposes of a collective action, a claim is deemed commenced: (a) on the date when the complaint is filed for a named party plaintiff; or (b) on the date when written consent is filed for an absentee plaintiff. 29 U.S.C. §256. The statute of limitations period continues to run with respect to each potential plaintiff's collective action claim until that individual files a written consent form. Lee v. ABC Carpet & Home, 236 F.R.D. 193, 199 (S.D.N.Y. 2006). "Signed consent forms do not relate back to the original filing date of the complaint." Id. "A cause of action under the FLSA accrues on the regular payday immediately following the work period for which services were rendered and not properly compensated." Doo Nam Yang v. ACBL Corp., 427 F. Supp. 2d 327, 337 (S.D.N.Y. 2005).

Except for Griffith, none of the plaintiff FLSA claims fall within the 2-year statute of limitations and no facts support a finding of willfulness. (Even to the extent that the 3 year limitation period applied, only Griffith, Speciale and Adams would have un-barred claims). Here, most of the claims accrued more than three years before filing of written consent forms. The following chart sets forth the Class Members' dates of employment and dates of filing their

Consent to Sue:[3]

| Name | Employment Start Date | Employment End Date | Consent Date | 2-Year Claim Period | 3-Year Claim Period |
|---|---|---|---|---|---|
| C. Griffith | 1/15/08 | 11/4/11 | 2/14/12 | 2/14/10-11/4/11 | 2/14/09-11/4/11 |
| D. Speciale | 3/18/03 | 1/19/10 | 2/14/12 | N/A | 2/14/09-1/19/10 |
| A. Adams | 10/13/10 | 6/16/11 | 8/9/13 | N/A | 10/13/10-6/16/11 |
| R. Francois | 6/12/03 | 11/2/06 | 8/9/13 | N/A | N/A |
| M. Miller | 3/13/08 | 4/28/09 | 8/9/13 | N/A | N/A |
| P. Calabrese | 6/24/09 | 1/19/10 | 8/15/13 | N/A | N/A |

Accordingly, all of the Class Members' claims are barred by the 2-year statute of limitations except Griffith. Because the Class Members have failed to demonstrate willful conduct, no claims are subject to the 3-year statute of limitations (even under a 3 year limitation period, claims of Francois, Miller and Calabrese would nevertheless be barred).

## III. THE CLASS MEMBERS ARE NOT SIMILARLY SITUATED

The Collective Action Members are not similarly situated and the class should be decertified because individual issues predominate. Given the "harmony of animating principles" between FLSA and Rule 23 certification, "it is not mere coincidence that courts facing parallel motions to decertify an FLSA collective action under Section 216(b) and to certify a class action under Rule 23 have tended to allow either both actions or neither to proceed on a collective basis." Ruiz v. Citibank, N.A., --- F.Supp.3d ----, 2015 WL 1254820 *15 (S.D.N.Y. 2015). Since the Court has already denied Rule 23 certification, the FLSA collective class should be decertified on similar grounds.

By decision dated March 12, 2015, the Court denied plaintiffs' motion for Rule 23 class

[3] Suess Dec. Ex. B (Speciale U5); Ex. A (Griffith U5); Ex. C (Miller U5); Ex. D (Miller Consent); Ex. L (Adams U5); Ex. M (Adams Consent); Ex. E (Francois U5); Ex. F (Francois Consent); Ex. G (Calabrese U5); Ex. H (Calabrese Consent).

certification. The Court found that the Class Members had no "particular fixed schedule applicable to all stockbrokers;" had different methods of compensation; worked under different written agreements or oral agreements; authorized deductions or did not; and failed to demonstrate a level of control by FFM over their means of employment. Suess Dec. Ex. J (March 12, 2015 decision). Because of a lack of predominance, these issues could not be determined in a class setting. Mini-trials would have to be held to determine the representations made to the Class Members by FFM as to the terms of their employment, actual hours worked, and hourly and overtime wages (which cannot be calculated using representative analysis). Because of this lack of predominance, the FLSA collective action should similarly be decertified.

A collective class under 29 USC § 216(b) requires the Class Members to demonstrate that they are "similarly situated". Once "discovery has been completed, and the case is ready for trial, the court will engage in the second stage of determining whether the plaintiffs are similarly situated for the purposes of maintaining the collective action." Rodolico v. Unisys Corp., 199 F.R.D. 468, 480 (E.D.N.Y. 2011). At the decertification stage, "the Court applies heightened scrutiny to this inquiry as compared to pre-discovery." Torres v. Gristede's Operating Corp., 2006 WL 2819730 at *9 (S.D.N.Y. 2006). If not similarly situated, "the class is decertified, the claims of the opt-in plaintiffs are dismissed without prejudice, and the class representative may proceed on his or her own claims." Lee v. ABC Carpet & Home, 236 F.R.D. 193, 197 (S.D.N.Y. 2006). "It is the named plaintiff who bears the burden of proving that the other employees are similarly situated." Indergit v. Rite Aid Corp., 293 F.R.D. 632, 639 (S.D.N.Y. 2013). As with the Rule 23 class which was denied, the Collective Action members are not similarly situated.

**A. Job Duties.** Class Members, who were either brokers or cold callers, performed

different duties. Griffith, Speciale, Adams, Calabrese and Francois were hired as cold callers.[4] Whereas, Griffith, Speciale and Miller were full-fledged brokers at the time they left FFM, Adams had not opened the required accounts and was still a cold-caller paid $60 per day when he left FFM. Declaration of Alonzo Adams sworn to April 24, 2014 at ¶¶ 26, 27. In contrast, Miller was hired as a full-time broker because when he joined Fordham already licensed. Baquet Dec. ¶ 16; Suess Dec. Ex. T (deposition transcript of Miller dated January 30, 2014 ("Miller Tr.")) at 14:9-15. When FFM agrees to sponsor someone for licensing with FINRA, they are a "trainee". Baquet Dec. ¶ 14. After passing the Series 7 and 63 exams and being licensed with FINRA, they work as "cold callers" under a senior broker, who trains them to become a full-time broker. Id. A cold caller is different from a broker. Id. Cold callers do not solicit clients for their own book of business; conduct research into the suitability of securities for clients; recommend securities for clients; and negotiate commissions with clients. Id. A cold caller is not recognized as a client's broker by FINRA and is typically not the representative on a client's account statements. Id.

Brokers are compensated differently at different stages, with cold callers paid a flat fee until they open up enough accounts (about 20) to transition to a full-fledged broker, which takes about 12-18 months. Id. at ¶ 15. Cold callers also enter into arrangements with the senior brokers they work under and other brokers at FFM to solicit clients on their behalf. Id. If a client opens an account, the cold caller receives a percentage of any commissions earned from the broker in addition to the flat fee of $60 per day. Id. Brokers receive no fixed salary; only commissions

---

[4] Baquet Dec. ¶ 16; Exs. H (Speciale Trainee Agreement), Ex. I (Calabrese Trainee Agreement), Ex. J (Adams Trainee Agreement); Suess Dec. Ex. N [Adams deposition transcript dated January 28, 2014 ("Adams Tr.")] at 23:13-24:7; Ex. O [Speciale deposition transcript dated February 25, 2014 ("Speciale Tr. II")] at 25:19-26:17; Ex. P [Calabrese deposition transcript dated January 28, 2014 ("Calabrese Tr.")] at 47:7-14; 55:1-12; Ex. Q [Griffith deposition transcript dated January 8, 2013 ("Griffith Tr. I")] at 26:17-27:17; Ex. R (Francois BrokerCheck Report).

earned on the sale of securities to their customers. Id. at ¶ 4.

Griffith, Speciale, Adams and Calabrese began their association with FFM as trainees/cold callers. See fn 4. Griffith and Speciale became full brokers. Adams and Francois **never** transitioned into full-time brokers because they were not with the firm long enough to open up the required accounts. Baquet Dec. ¶ 16. Adams only worked as a cold caller for Griffith and Josh Conroy and as a joint representative with them. Adams never had his own customers. Suess Dec. Ex. Q (Griffith Tr. I) at 49:20-50:7; Ex. U (deposition transcript of Griffith dated February 25, 2014 ("Griffith Tr. II")) at 28:14-19; 31:6-13. Adams and Calabrese received a fixed weekly salary. Suess Dec. Ex. SS (Adams NTA) at 9; Ex. RR (Calabrese NTA) at 9. Calabrese terminated his employment with FFM after opening up the required accounts, but never worked as a broker with FFM. The payment of fees to each broker class member varied greatly and also varied over time.

**B. Terms of Employment.** The Class Members also did not work under common terms of employment. Griffith, Speciale, Adams, Calabrese and Miller interviewed with various representatives of FFM, but none recalled what representations were made to them about the duties expected and compensation.[5] Once hired, they had different supervisors.[6]

The terms of Griffith's and Miller's employment were reduced to a written Registered Representative Agreement. Suess Dec. Ex. Q (Griffith Tr. I) at 25:6-26:8; Ex. T (Miller Tr.) at 31:12-13; Ex. K (Griffith NTA) at 15; Ex. PP (Miller NTA) at 15; Baquet Dec. Exs. B & C

---

[5] Suess Dec. Ex. Q (Griffith Tr. I) at 40:2-18; 105:6-106:4; 106:21-107:10; Ex. V [Speciale deposition transcript January 8, 2013 ("Speciale Tr. I")] at 53:16-18; 22:11-23:5; 26:12-14; Ex. T (Miller Tr.) at 54:3-57:16; 59:1-60:8; 69:14-70:12; Ex. P (Calabrese Tr.) at 59:8-60:1; 55:1-19; 67:13-23; Ex. N (Adams Tr.) at 9:14-10:1; 16:11-18:11; 56:22-24; 23:13-24:16; 41:18-42:23; 47:14-20.

[6] Suess Dec. Ex. Q (Griffith Tr. I) at 26:13-27:5; 37:6-38:15; Ex. O (Speciale Tr. II) at 41:9-43:24; Ex. T (Miller Tr.) at 33:14-15; 39:19-21; Ex. P (Calabrese Tr.) at 43:16-18; 45:24-46:7; Ex. N (Adams Tr.) at 37:13-32; 38:16-23; 40:15-41:7; 5:24-56:24; Ex. V (Speciale Tr. I) at 13:5-17.

(Agreement). The Agreements provide that Griffith and Miller: (a) are paid a commission only; (b) must comply with all rules and regulations of FINRA, the SEC, and any other self-regulatory organization; and (c) agree to a variety of deductions from their commissions for expenses incurred as result of running their own business. Baquet Dec. ¶ 9; Exs. B & C (Agreement) at ¶ 2 (Compensation); ¶ 3 (Scope of Employment); and Compensation Schedule (attached to Agreements). Griffith and Miller acknowledged and agreed to these terms in the schedule to their Agreements. Baquet Dec. Exs. B & C (Agreement); Suess Dec. Ex. Q (Griffith Tr. I) at 25:6-26:8; 78:4–82:20; 95:8-11; 113:6–114:8; Ex. T (Miller Tr.) at 31:12-13.

Speciale, Calabrese and Adams only entered into trainee agreements, which were limited to the terms of the trainee's licensing and do not provide for a commission split with FFM and deductions from commissions; those terms are based upon oral representations only and must be examined individually by the trier of fact. Baquet Dec. Ex. H (Speciale Agreement); Ex. I (Calabrese Agreement); Ex. J (Adams Agreement). There is no record of Francois signing either a Registered Representative or Trainee Agreement. Testimony is required from Speciale, Adams, Calabrese and Francois as to the terms of their employment, commission splits, deductions and hours of attendance in the absence of a written agreement. Testimony also is required from their supervisors as to the representations made to them as to the terms of their association (hours, commissions, deductions from commissions) with FFM.

Griffith, Adams and Calabrese also received FFM's Employment Handbook setting forth specific employment terms.[7] Suess Dec. Ex. Q (Griffith Tr. I) at 26:9-12; Ex. P (Calabrese Tr.) at 23:21-24:16; Ex. N (Adams Tr.) at 29:17-30:15. The Handbook identifies them as

---

[7] It is defendants' contention that all cold callers and brokers were provided with a copy of the Handbook upon commencement of their association with FFM.

Commissioned Employees whose compensation is based upon commissions only and states that they are **not** subject to any attendance policies. Baquet Aff. Ex. D (Handbook) at 7 ("Employee Classification"). Commissioned Employees do not receive any benefits available to full and part-time employees. Id. at 17-18 ("Employee Benefits"). Speciale and Miller denied receiving a copy of the Handbook. Suess Dec. Ex. V (Speciale Tr. I) at 24:2-6; Ex. T (Miller Tr.) at 33:8-10.

Griffith, Adams and Calabrese testified, that despite the Handbook, they were told that they had to work 10 hours per day. Suess Dec. Ex. Q (Griffith Tr. I) at 105:6-106:4; Ex. P (Calabrese Tr.) at 21:3-9; 59:8-22; Ex. N (Adams Tr.) at 9:14-10:1; 16:11-18:11; 29:17-30:15; 55:24-56:24. To the extent that their testimony diverges from the Handbook, their testimony and that of their supervisors is required at trial to harmonize these discrepancies.

Speciale and Miller deny receiving a copy of the Handbook. Suess Dec. Ex. V (Speciale Tr. I) at 24:2-6; Ex. T (Miller Tr.) at 33:8-10. Without a written agreement setting forth their hours of attendance, Speciale, Miller and their supervisors must be examined to determine what they were told about the hours of attendance during their interviews. Declarations submitted by Speciale's and Miller's supervisors, as well as additional declarations submitted herewith, all dispute that they and the other Class Members and brokers at FFM were ever required to work set hours.[8] (The issue of no working overtime hours is also deemed admitted against Griffith and

[8] Baquet Dec. ¶¶ 5-7, 24; Suess Dec. ¶¶ 23–30; Ex. V (Speciale Tr. I) at 57:19-21; Ex. N (Adams Tr.) at 63:17-65:9; Ex. P (Calabrese Tr.) at 59:8-60:1; Ex. T (Miller Tr.) at 61:7-62:6; Ex. U (Griffith Tr. II) at 23:14-25:1; Ex. W [Declaration of Charles Giordano, Sr. sworn to February 15, 2013 ("Giordano Sr. Dec.")] at ¶ 4; Ex. X [Declaration of Rich Adams sworn to July 10, 2015 ("R. Adams Dec.")] at ¶ 4; Ex. Y [Declaration of Jeffrey Haddad sworn to February 15, 2013 ("Haddad Dec.")] at ¶ 4; Ex. Z [Declaration of Charles Giordano Jr. sworn to February 15, 2013 ("Giordano Jr. Dec.")] at ¶ 4; Ex. AA [Declaration of Blair Spruill sworn to July 10, 2015 ("Spruill Dec.")] at ¶ 4; Ex. BB [Declaration of Allen Gordon sworn to February 14, 2013 ("Gordon Dec.")] at ¶ 4; Ex. CC [Declaration of Nanci Hom sworn to February 15, 2013 ("Hom Dec.")] at ¶ 4; Ex. DD [Declaration of Jose Martinez sworn to July 10, 2015 ("Martinez Dec.")] at ¶ 4; Ex. EE [Declaration of Josh Conroy sworn to February 15, 2013 ("Conroy Dec.")] at ¶ 4; Ex. FF [Declaration of Kolinda Tomasic sworn to February 15, 2013 ("Tomasic Dec.")] at ¶¶ 4, 6; Ex. GG [Declaration of Edward Baquet sworn to on February 17, 2013 ("E. Baquet Dec.")] at ¶ 4; Ex. HH [Declaration of Phyllis Henderson sworn to February 18, 2013 ("Henderson Dec. I")] at ¶ 4; Ex. II [Declaration of William Cawsey sworn to February 16, 2013 ("Cawsey Dec.")] at ¶ 4.

Miller-see Point I above). Suess Dec. Ex. K (Griffith NTA) at 21; Ex. PP (Miller NTA) at 20.

C. **Hours of Attendance**. The Class Members admit there was no common attendance policy. The Handbook and testimony confirms that FFM had no mandatory hours of attendance for the Class Members. Brokers determined their own hours and none worked the same hours. It is the plaintiffs' burden to demonstrate that FFM had actual or constructive knowledge that they worked more than 40 hours per week. Zivali supra at 467-468 (citation omitted). Proof in this regard requires individualized testimony from every supervisor—current and past—of the Class Members, which is highly fact-specific. Id. These individualized issues require that the class be decertified. Zivali supra (class decertified where company timekeeping and overtime practices were not sufficiently uniform and pervasive as to warrant class treatment); Tracy v. NVR, Inc., 293 F.R.D. 395 (W.D.N.Y. 2013) (same).

The Class Members admittedly have no attendance records. Suess Dec. Ex. K (Griffith NTA) at 27, 32; Ex. S (Speciale NTA) at 23, 28; Ex. PP (Miller NTA) at 26, 34; Ex. QQ (Francois NTA) at 20, 25; Ex. RR (Calabrese NTA) at 26, 31; Ex. SS (Adams NTA) at 27, 32. The only records available that indicate the Class Members' attendance are their emails, which confirm that they were rarely in the office before 9:00 a.m. or after 6:00 p.m. Henderson Dec. III ¶¶ 2-7; Exs. A-E. This confirms declarations submitted by FFM that brokers were allowed unfettered discretion to set their own hours; they were on no fixed schedule and worked at their own convenience.[9]

---

[9] Baquet Dec. ¶¶ 5, 6, 17-19, 24; Suess Dec. Ex. X (Adams Dec.) ¶ 4; Ex. BB (Gordon Dec.) ¶ 4; Ex. CC (Hom Dec.) ¶ 4; Ex. DD (Martinez Dec.) ¶ 4; Ex. EE (Conroy Dec.) ¶ 4; Ex. Y (Haddad Dec.) ¶ 4; Ex. W (Giordano Sr. Dec.) ¶ 4; Ex. Z (Giordano Jr. Dec.) ¶ 4; Ex. AA (Spruill Dec.) ¶ 4; Ex. FF (Tomasic Dec.) ¶¶ 4, 6; Ex GG (E. Baquet Dec.) ¶ 4; Ex. HH (Henderson Dec.) ¶ 4; Ex. ZZ (Phyllis Henderson Declaration dated July 30, 2014 (Henderson Dec. II")] at ¶ 3.

The Class Members' testimony confirms that they did not all work the same hours, and did not always work a full week. Speciale testified that he went to the office "just about every day" but later admitted he only worked on weekends "occasionally" and no more than six (6) times per year; and admitted to taking time off. Suess Dec. Ex. V (Speciale Tr. I) at 53:16-18; 59:11-23; 60:24-61:9. Griffith admitted that he took vacation, as did other brokers at FFM, and was out three weeks for knee surgery. Suess Dec. Ex. Q (Griffith Tr. I) at 113:11-114:8; 119:24-120:9. Miller testified that he went to the office only "95 percent of the time" and took off Fridays every six (6) weeks. Id. at Ex. T (Miller Tr.) at 54:3-57:16; 59:1-60:8; 61:2-62:6; Ex. PP (Miller NTA) at 30. Pursuant to the Notices to Admit served, it is deemed admitted against Griffith and Miller that they worked from 9:30 a.m. to 4:30 p.m.; had discretion to set their own hours and did so; are not entitled to compensation for work done outside of 8:00 a.m. to 6:00 p.m.; FFM did not require them to work more than 40 hours per week; they never worked more than 40 hours per week; they did not work weekends, but if so it was without approval; they did not ask for permission to work overtime; and they took vacation, personal days and sick days at their discretion. Id. at Ex. K (Griffith NTA) at 25, 26, 28-31, 33, 37-39; Ex. PP (Miller NTA) at 24, 25, 27, 28, 31-33, 35-37, 39-42. Miller also admitted that he was not required to work from 8:00 a.m. to 6:00 p.m. in the first place. Id. at 68:23-71:18. The Court must make an individual assessment of each Class Members' dates and hours of attendance to calculate their purported damages. Each Class Member cannot simply claim that they worked in excess of 40 hours per week each week given their admissions that they did not work pursuant to a set attendance policy and had great flexibility in setting their own actual work hours.

**D.** **Damages**. The Class Members' attendance is related to their purported damages. In this matter, the Class Members are not similarly situated because they are not all pursuing

claims for **all** hours worked as per the Complaint. Griffith admitted that if he arrived at the office prior to the 8:30 a.m. meeting it was his decision alone. Suess Dec. Ex. Q (Griffith Tr. I) at 106:21-107:10. Adams never asked permission to work overtime, and says he went to the office on the weekends on his own time. Suess Dec. Ex. N (Adams Tr.) at 63:17-65:9. Calabrese admits that no one told him he had to work overtime and does not know if anyone knew that he was working overtime. Suess Dec. Ex. P (Calabrese Tr.) at 64:9-24. Miller testified that any work before 8:00 a.m. and after 6:00 p.m. that it was "on me" for which FFM is not responsible, and also never sought approval to work overtime. Miller also admitted that he was not required to work from 8:00 a.m. to 6:00 p.m. in the first place. Suess Dec. Ex. T (Miller Tr.) at 68:23-71:18.

These admissions illustrate other issues on which Class Members are also not similarly situated. Adams and Calabrese waived compensation for any work on weekends; Griffith waived compensation for working before 8:30 a.m.; and Miller waived compensation for **all** hours worked because he admitted he was not required to work any set hours.

**E. Compensation.** Compensation was also markedly different between Opt-In Class Members. Calabrese, Francois and Adams started as salaried trainees and only received commissions on accounts they opened for other broker (not for their own accounts)-and these arrangements were negotiated directly with the other brokers. Griffith, Speciale and Miller, by contrast, earned commissions on their own accounts (and did not receive salaries). Earned commissions varied monthly depending on the transactions made by the Class Members' respective customers, the amount of commission charged by the brokers (at their own discretion), and the various commission splits each had with FFM. Each broker also charged different amounts to their clients on each transaction. The brokers had sole discretion to set the amount of commission to charge their customers within the regulatory guidelines. Speciale and

Griffith earned significantly more than the minimum wage and are thus not similarly situated to the Opt-In members. Furthermore, Speciale and Griffith, as high wage earners, are not entitled to overtime because they are not the intended beneficiaries of the FLSA.

Griffith and Speciale earned more than the minimum wage, and Speciale earned more than the overtime wage on an annual basis. Calculating these figures on an annual basis is appropriate in these circumstances. Schwind v. EW & Associates, Inc., 357 F.Supp.2d 691, 568 (S.D.N.Y. 2005) ("because of the fluctuating and irregular schedule in which plaintiff was paid...it is unlikely that Congress meant to require employers to pay overtime in the lean weeks when the fat weeks more than make up.") (citation omitted). Speciale earned $64,319.22 in 2006 (4.6 times the minimum wage); $93,802.76 in 2007 (6.3 times the minimum wage); $93,842.00 in 2008 (6.3 times the minimum wage); $60,840.87 in 2009 (4.1 times the minimum wage); and $3,420.00 for the 19 days he worked in 2010 (3.1 times the minimum wage). Suess Dec. Ex. KK (Speciale's W-2s). Griffith earned $15,631.00 in 2009 and $31,515.00 in 2011, which also is above the minimum wage. Id. at Ex. LL (Griffith's W-2s). Accordingly, both are inadequate representatives on the minimum wage claims, and Speciale is inadequate on the overtime claims. (This also defeats their claims directly).

## IV.  THE CLASS MEMBERS ARE INDEPENDENT CONTRACTORS

All of the Class Members are exempt from the wage and hour provisions of the FLSA and NYLL because they are independent contractors. Schwind supra at 700 (FLSA and NYLL "overtime provisions...apply only to individuals who are "employees.""). The determination of whether the Class Members are independent contractors requires an individualized inquiry, which also defeats the purpose of a collective action and requires decertification. Shayler v. Midtown Investigations, Ltd., 2013 WL 772818 at *9 (S.D.N.Y. 2013) ("The inquiry as to

whether an individual is an independent contractor or employee is fact specific and may be employee specific: where did he or she work and what were the conditions there? Who was the supervisor and were representations made? How was he/she compensated? For how long a period was he/she employed?"); Spellman v. American Eagle Exp., Inc., 2013 WL 1010444 at *2 (E.D.Pa. 2013) (collective action class decertified where "resolving the collective class's claims would require an individual examination of each driver's relationship with AEX[.]"); Camesi v. University of Pittsburgh Medical Center, 2011 WL 6372873 at *9 (W.D.Pa. 2011) (collective action class decertified where court would be required to determine "whether individual opt-ins were exempt from the FLSA for any relevant period of time.").

When analyzing a wage and hour claim, an employer-employee relationship under the FLSA depends "upon the circumstances of the whole activity." Schwind at 700. An "economic reality test" is applied to determine whether an individual is an employee or an independent contractor. Id. In applying the economic reality test, a court must consider: (i) the degree of the employer's control over the worker; (ii) the worker's opportunity for profit or loss and his investment in the business; (iii) the degree of skill and independent initiative required to perform the work; (iv) the permanence or duration of the working relationship; and (v) the extent to which the work is an integral part of the employer's business. Id. "The ultimate concern is whether, as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in business for themselves." Brock v. Superior Care, Inc., 840 F.2d 1054, 1059 (2d Cir. 1988). The economic reality test confirms that the Class Members are independent contractors because defendants did not control their means of production.

Employing the economic reality test, numerous factors cited by the Spellman court are applicable here and make clear that the class brokers are independent contractors; not employees.

Spellman at *3. The Class Members were allowed unfettered discretion to set their own hours; they were on no fixed schedule and worked at their own convenience. See fn 8, 9. Several Class Members admitted that they did not request permission to work overtime.[10] FFM did not require plaintiffs to sell any particular securities;[11] FFM had no mandatory morning meetings;[12] and FFM did not fine or terminate brokers for failing to attend any morning meetings, or come into the office.[13] All of the business conducted by the brokers was the result of their own efforts.[14] Baquet Dec. ¶¶ 4-7, 17-19. The split in commissions between the brokers and FFM also weighed heavily in favor of the brokers. Typically, the brokers kept at least 50% of the commissions they generated with some brokers keeping as much as 70-72.5 percent. Id. at ¶ 10. Furthermore, no customer leads were provided by FFM. Id. at ¶ 18. The brokers determined which securities were

---

[10] Suess Dec. Ex. K (Griffith NTA) at 25, 26, 28-31, 33, 37-39; Ex. SS (Adams NTA) at 33; Ex. RR (Calabrese NTA) at 32; Ex. S (Speciale NTA) at 29; Ex. PP (Miller NTA) at 24, 25, 27, 28, 31-33, 35-37, 39-42.

[11] Baquet Dec. ¶¶ 7, 17-19; Suess Dec. ¶ 31(d); Ex. X (R. Adams Dec.) at ¶ 4; Ex. BB (Gordon Dec.) at ¶ 4; Ex. CC (Hom Dec.) at ¶ 5; Ex. DD (Martinez Dec.) at ¶ 4; Ex. EE (Conroy Dec.) at ¶ 4; Ex. Y (Haddad Dec.) at ¶ 4; Ex. W (Giordano Sr. Dec.) at ¶ 4; Ex. Z (Giordano Jr. Dec.) at ¶ 5; Ex. AA (Spruill Dec.) at ¶ 5; Ex. FF (Tomasic Dec.) at ¶ 5; Ex. GG (E. Baquet Dec.) at ¶ 4; Ex. HH (Henderson Dec. I) at ¶ 5; Ex. II (Cawsey Dec.) at ¶ 4; Ex. V (Speciale Tr. I) at 29:12–23; 70:6-73:9; Ex. Q (Griffith Tr. I) at 56:8-58:11; 59:3-60:9; Ex. P (Calabrese Tr.) at 49:24-53:4; Ex. N (Adams Tr.) at 35:7-23; Ex. T (Miller Tr.) at 44:16-45:9; Ex. K (Griffith NTA) at 21, 57; Ex. PP (Miller NTA) at 20, 59.

[12] Baquet Dec. ¶¶ 5-7, 24, 26; Suess Dec. ¶ 35-37; Ex. X (R. Adams Dec.) at ¶ 4; Ex. BB (Gordon Dec.) at ¶ 4; Ex. CC (Hom Dec.) at ¶ 5; Ex. DD (Martinez Dec.) at ¶ 4; Ex. EE (Conroy Dec.) at ¶ 4; Ex. Y (Haddad Dec.) at ¶ 4; Ex. W (Giordano Sr. Dec.) at ¶ 4; Ex. Z (Giordano Jr. Dec.) at ¶ 5; Ex. AA (Spruill Dec.) at ¶ 5; Ex. FF (Tomasic Dec.) at ¶ 5; Ex. GG (E. Baquet Dec.) at ¶ 4; Ex. HH (Henderson Dec. I) at ¶ 5; Ex. II (Cawsey Dec.) at ¶ 4; Ex. V (Speciale Tr. I) at 54:24-56:2; Ex. Q (Griffith Tr. I) at 98:3-6; Ex. U (Griffith Tr. II) at 51:25-52:9; Ex. N (Adams Tr.) at 61:1-24; Ex. T (Miller Tr.) at 30:20-23; 56:4-6; 79:18-80:3; Ex. P (Calabrese Tr.) at 59:5-22.

[13] Baquet Dec. ¶¶ 7, 26; Suess Dec. ¶ 31–32; Ex. X (R. Adams Dec.) at ¶ 4; Ex. BB (Gordon Dec.) at ¶¶ 4, 5; Ex. CC (Hom Dec.) at ¶¶ 5, 9; Ex. DD (Martinez Dec.) at ¶ 4; Ex. EE (Conroy Dec.) at ¶ 4; Ex. Y (Haddad Dec.) at ¶ 4; Ex. W (Giordano Sr. Dec.) at ¶ 4; Ex. Z (Giordano Jr. Dec.) at ¶ 6; Ex. AA (Spruill Dec.) at ¶ 5; Ex. FF (Tomasic Dec.) at ¶¶ 6, 9; Ex. GG (E. Baquet Dec.) at ¶ 4; Ex. HH (Henderson Dec. I) at ¶¶ 6, 9; Ex. II (Cawsey Dec.) at ¶ 4; Ex. V (Speciale Tr. I) at 67:15-68:3; Ex. Q (Griffith Tr. I) at 83:20-87:8; 134:3-135:7; Ex. T (Miller Tr.) at 73:10-13.

[14] Suess Dec. Ex. V (Speciale Tr. I) at 35:8-37:11; 40:4-41:7; Ex. Q (Griffith Tr. I) at 53:1–54:2; 55:16–19; 60:10–15; 63:2-65:15; 68:3-16; 82:21-83:19; Ex. T (Miller Tr.) at 33:19-35:13; see also Ex. K (Griffith NTA) at 53, 55; Ex. S (Speciale NTA) at 49, 51; Ex. PP (Miller NTA) at 55, 57; Ex. QQ (Francois NTA) at 46; Ex. RR (Calabrese NTA) at 52, 54; Ex. SS (Adams NTA) at 53, 55.

appropriate to recommend to their clients in their sole discretion and advised them accordingly.[15] As Griffith testified, "**I was in full control of bringing the client ideas and soliciting them for – to purchase more financial product from us, being informed of product placement, stock, et cetera. That was my duty.**" Suess Dec. Ex. Q (Griffith Tr. I) at 52:20-24 (emphasis added). If a broker required an assistant or cold caller, a charge for such services was deducted from the broker's commissions. Baquet Dec. ¶ 12. Subject to FINRA rules, the brokers were free to engage in other employment and business related activities. Id. at ¶¶ 9, 20-22. The brokers received no benefits other than the option to participate in FFM's 401k Plan and its health insurance plan at their own expense. Id. at ¶ 4. FFM provided no paid vacation. Id. at ¶ 5. Brokers also retained the discretion to set the amount of commissions charged to the customer (for which they should be equitably estopped from alleging that they were not paid the minimum wage when they were responsible for determining their earnings).[16] Brokers are free to take the clients they bring into FFM with them when and if they go to another firm.[17]

---

[15] Baquet Dec. ¶¶ 7, 17-19; Suess Dec. ¶ 29; Ex. X (R. Adams Dec.) at ¶ 4; Ex. BB (Gordon Dec.) at ¶ 4; Ex. CC (Hom Dec.) at ¶ 5; Ex. DD (Martinez Dec.) at ¶ 4; Ex. EE (Conroy Dec.) at ¶ 4; Ex. Y (Haddad Dec.) at ¶ 4; Ex. W (Giordano Sr. Dec.) at ¶ 4; Ex. Z (Giordano Jr. Dec.) at ¶ 4; Ex. AA (Spruill Dec.) at ¶ 5; Ex. FF (Tomasic Dec.) at ¶¶ 4, 5; Ex. GG (E. Baquet Dec.) at ¶ 4; Ex. HH (Henderson Dec. I) at ¶ 4; Ex. II (Cawsey Dec.) at ¶ 4; Ex. V (Speciale Tr. I) at 27:9-32:7; Ex. Q (Griffith Tr. I) at 53:1-17; Ex. N (Adams Tr.) at 34:12-35:23; 37:23-38:15; Ex. P (Calabrese Tr.) at 51:1-12; Ex. T (Miller Tr.) at 37:3-39:2; Ex. K (Griffith NTA) at 56; Ex. PP (Miller NTA) at 58; Ex. RR (Calabrese NTA) at 55; Ex. SS (Adams NTA) at 56.

[16] Baquet Dec. ¶ 19; Ex. K (Speciale Memoranda); Suess Dec. ¶ 29; Ex. X (R. Adams Dec.) at ¶ 4; Ex. BB (Gordon Dec.) at ¶ 4; Ex. CC (Hom Dec.) at ¶ 5; Ex. DD (Martinez Dec.) at ¶ 4; Ex. EE (Conroy Dec.) at ¶ 4; Ex. Y (Haddad Dec.) at ¶ 4; Ex. W (Giordano Sr. Dec.) at ¶ 4; Ex. Z (Giordano Jr. Dec.) at ¶ 4; Ex. AA (Spruill Dec.) at ¶ 5; Ex. FF (Tomasic Dec.) at ¶¶ 4, 5; Ex. GG (E. Baquet Dec.) at ¶ 4; Ex. HH (Henderson Dec. I) at ¶ 4; Ex. II (Cawsey Dec.) at ¶ 4; Ex. V (Speciale Tr. I) at 41:9-45:20; Ex. Q (Griffith Tr. I) at 60:16-63:1; 69:19-70:18; 91:6-24; Ex. P (Calabrese Tr.) at 68:16-22; Ex. T (Miller Tr.) at 40:3-43:5; 44:7-10; Ex. K (Griffith NTA) at 58; Ex. S (Speciale NTA) at 54; Ex. PP (Miller NTA) at 60; Ex. SS (Adams NTA) at 58.

[17] Baquet Dec. ¶ 8; Suess Dec. Ex. X (R. Adams Dec.) at ¶ 6; Ex. BB (Gordon Dec.) at ¶ 6; Ex. CC (Hom Dec.) at ¶ 10; Ex. DD (Martinez Dec.) at ¶ 6; Ex. EE (Conroy Dec.) at ¶ 6; Ex. Y (Haddad Dec.) at ¶ 7; Ex. W (Giordano Sr. Dec.) at ¶ 6; Ex. Z (Giordano Jr. Dec.) at ¶ 9; Ex. AA (Spruill Dec.) at ¶ 5; Ex. FF (Tomasic Dec.) at ¶ 10; Ex. GG (E. Baquet Dec.) at ¶ 6; Ex. HH (Henderson Dec. I) at ¶ 10; Ex. II (Cawsey Dec.) at ¶ 6; Ex. Q (Griffith Tr. I) at 68:20-69:18; Ex. V (Speciale Tr. I) at 38:6-39:9; Ex. K (Griffith NTA) at 59; Ex. PP (Miller NTA) at 61.

Griffith and Miller agreed to these terms in the schedule to their written agreements with FFM. Baquet Dec. Ex. B & C (Griffith & Miller Agreements); Suess Dec. Ex. Q (Griffith Tr.) at 78:4–82:20; 95:8-11; 113:6–114:8. The Handbook also made clear that brokers were free to set their own hours of attendance. Baquet Dec. ¶¶ 5-7, 24; Ex. D (Handbook); Ex. E, F & G (Griffith, Adams & Calabrese Acknowledgments). In such circumstances, an employer/employee relationship does not exist. Arena v. Delux Transp. Services, Inc., 3 F.Supp.3d 1 (E.D.N.Y. 2014) (taxi driver was independent contractor where he controlled how much money he earned, company did not control when driver drove, how much he drove, or how frequently, driver set his own schedule, driver could cancel scheduled days at his choosing without any repercussions); Lamson v. EMS Energy Marketing Service, Inc., 868 F.Supp.2d 804, 814-815 (E.D.Wis. 2012) (sales position was an independent contractor where when and where to contact leads was entirely up to the worker, the worker was not required to work any specific hours or any fixed number of hours, income was conditioned solely on the amount of sales, and employee benefits were not provided); Walker v. Bankers Life & Cas. Co., 2008 WL 2883614 *6-7 (N.D. Ill. 2008) (insurance brokers were independent contractors where they set their own hours, were licensed by the state, were paid solely in commissions, received no benefits and the means of generating sales was not controlled by the putative employer).

### A. Compensation from Commissions Indicates an Independent Contractor

Independent contractors are not employees. Id. Compensation payable from commissions rather than a fixed salary points to an independent contractor relationship. Evans v. MassMutual Financial Group, 856 F.Supp.2d 606, 610 (W.D.N.Y. 2012) ("The fact that plaintiff received commissions rather than a salary, for example, tends to indicate that he may have been an independent contractor."); Lamson at 815 (E.D.Wis. 2012) (payment of commissions "suggests

an independent contractor relationship"); Smith-Johnson v. Thrivent Financial for Lutherans, 2005 WL 1705471 *4 (M.D.Fla. 2005) (same). Here, the Class Members admit that as full-time brokers (not trainees) their compensation was based purely on commissions. Baquet Dec. Ex. A (Complaint) at ¶ 28; Griffith Declaration sworn to March 29, 2014 ("Griffith Dec. II")) at ¶ 30; Speciale Declaration sworn to April 2, 2014 ("Speciale Dec. II")) at ¶ 27.

**B. Autonomy Over One's Business Indicates an Independent Contractor**

A worker's autonomy and control over their own schedules and assignments, and servicing of their own clients also reflects an independent contractor. Walker at *6-7 (independent contractor where agents control hours, schedules and manners of sales); Desimone v. Allstate Ins., 2000 WL 1811385 *11-12 (N.D.Cal. 2000) (independent contractor where agent controls hours, schedules and manners of sales, and may hire employees to assist and are responsible for their compensation and terms and conditions of employment); Schweiger v. Farm Bureau Ins. Co., 207 F.3d 480, 485-486 (8th Cir. 2000) (independent contractor where agent was licensed, controlled working hours, and was responsible for terms, conditions and salaries of assistants); Smith-Johnson at *5 (same); Velu v. Velocity Express, Inc., 666 F.Supp.2d 300, 308 (E.D.N.Y. 2009) (independent contractor where delivery driver had significant control over his job and daily schedule, and discretion to conduct his work); Browning v. Ceva Freight, LLC, 885 F.Supp.2d 590 (E.D.N.Y. 2012) (independent contractors where drivers could accept or decline delivery assignments, select assignments when they chose to work, hire additional workers to assist with operations, and were not subject to a fixed schedule).

Here, the Class Members had complete discretion to: (a) determine the means of obtaining new clients; (b) recommend securities to their clients; (c) determine the commission charged to their clients; and (d) set their hours of attendance including the decision to take

personal, holiday and vacation days, and did not ask permission to work overtime.[18] (These facts are admitted in the NTA). The Class Members' allegation that FFM required them to adhere to its attendance policy is outright false.[19] The Handbook states that brokers such as the Class Members are "Commissioned Employees" are exempt from FFM's attendance policy. Baquet Dec. ¶ 13; Ex. D (Handbook) at 7, 14. Furthermore, the only limitation on the Class Members' autonomy in carrying out their business was to ensure compliance with applicable rules and regulations of FINRA, the SEC, and various state and federal laws relating to insider trading, penny stocks and money laundering. Baquet Dec. ¶¶ 20, 22. For this reason, FFM required the Class Members to maintain notes of their transactions with clients; prohibited them from working for another broker-dealer simultaneously; and reviewed, processed and approved their trading activity.[20] This supervision is not deemed control over the means of the Class Members' production as a matter of law but was merely in furtherance of regulatory compliance function provided by FFM (see below).

### C. Ensuring Compliance with Laws, Rules and Regulations <u>Is not Indicative of Control Over an Employee</u>

---

[18] Baquet Dec. ¶¶ 5-7, 13, 17-19, 24-26; Suess Dec. ¶ 29 (and citations to transcripts therein); Ex. K (Griffith NTA) at 25, 26, 28-31, 33, 37-39; Ex. SS (Adams NTA) at 33; Ex. RR (Calabrese NTA) at 32; Ex. S (Speciale NTA) at 29; Ex. PP (Miller NTA) at 24, 25, 27, 28, 31-33, 35-37, 39-42; <u>see also</u> fn 7, 10-12, 14.

[19] Baquet Dec. ¶¶ 5-7, 24, 26; Suess Dec. ¶ 22–28; Suess Dec. Ex. X (R. Adams Dec.) at ¶ 4; Suess Dec. Ex. BB (Gordon Dec.) at ¶¶ 4, 5; Suess Dec. Ex. CC (Hom Dec.) at ¶¶ 4-6, 9; Suess Dec. Ex. DD (Martinez Dec.) at ¶ 4; Suess Dec. Ex. EE (Conroy Dec.) at ¶ 4; Suess Dec. Ex. Y (Haddad Dec.) at ¶ 4; Suess Dec. Ex. W (Giordano Sr. Dec.) at ¶ 4; Suess Dec. Ex. Z (Giordano Jr. Dec.) at ¶¶ 4-6; Suess Dec. Ex. AA (Spruill Dec.) at ¶¶ 4, 5; Suess Dec. Ex. FF (Tomasic Dec.) at ¶¶ 4-6, 9; Suess Dec. Ex. GG (E. Baquet Dec.) at ¶ 4; Suess Dec. Ex. HH (Henderson Dec.) at ¶¶ 4-6, 9; Suess Dec. Ex. II (Cawsey Dec.) at ¶ 4.

[20] Baquet Dec. ¶¶ 20, 22; Suess Dec. Ex. V (Speciale Tr. I) at 41:9–45:20; 70:5-73:9; Ex. Q (Griffith Tr. I) at 60:16-63:1; 69:19-70:18; 91:6-24; 135:8-137:5; Ex. P (Calabrese Tr.) at 26:10-28:1; 68:16-22; Ex. T (Miller Tr.) at 40:3-43:5; 44:7-10.

FFM did not control the brokers' means of production by supervising trades in order to ensure compliance with various laws, rules and regulations.[21] Simply ensuring that a broker complies with state and federal laws does not indicate control over the means of generating commissions. Walker at *7 (training regarding advertising, prohibited discrimination and disclosures required by California law is not control) citing Desimone at *12-13 (training and licensing requirements for insurance agents to comply with state and federal law is not right to control plaintiffs' business); Schweiger at 485 (review of agent's advertising for compliance with government and industry guidelines not control over details of business). As discussed above, FFM supervised, reviewed and approved (or disapproved) trading activity only to ensure compliance with laws, rules and regulations relating to securities; not for the purpose of controlling their means of production. The Class Members agreed to comply with these rules and regulations by signing various disclosure forms and pursuant to FINRA licensing requirements. Baquet Aff. at Exs. L-O (plaintiffs' disclosures). These are not requirements of FFM, which is merely ensuring compliance with FINRA rules and regulations and other applicable laws.[22]

**D. A License to Conduct Business Indicates an Independent Contractor**

It is indisputable that the Class Members were licensed securities brokers with FINRA. A license to conduct business is a further indication of an independent contractor rather than an employee. Walker at *8 citing Schweiger at 485 (licensing weighed heavily in favor of independent contractor); Smith-Johnson at *4 (independent contractor because "the sale of

[21] Plaintiffs have not explained how FFM requiring them to submit fingerprints and attend continuing education classes, as per FINRA rules and regulations, entails controlling their means of production. In point of fact, the Class Members admitted these were FINRA requirements; not a policy of FFM. Suess Dec. Ex. Q (Griffith Tr. I) at 123:9-13; 136:23–137:5; Ex. P (Calabrese Tr.) at 26:10-28:1; 54:1-11; Ex. V (Speciale Tr. I) at 72:17–73:9; Ex. K (Griffith NTA) at 24, 61; Ex. S (Speciale NTA) at 20, 57; Ex. PP (Miller NTA) at 23, 63; Ex. QQ (Francois NTA) at 17, 54; Ex. RR (Calabrese NTA) at 23, 60; Ex. SS (Adams NTA) at 24, 61.

[22] Baquet Dec. ¶¶ 20, 22; Suess Dec. Ex. Q (Griffith Tr. I) at 135:8–136:22; Ex. V (Speciale Tr. I) at 70:5–72:4.

insurance and other financial products is a highly specialized and heavily regulated field"). In this case, the Class Members were required by law to obtain a securities license with FINRA before performing services as a broker.

## V. THE CLASS SHOULD BE DECERTIFIED BECAUSE THE CLASS MEMBERS' TESTIMONIES THEMSELVES ARE CONTRADICTORY AND NOT CREDIBLE

The class also should be decertified because the Class Members' testimonies make clear that their credibility is at issue. Where, as here, the credibility of the class representatives is at issue, a class should not be certified. Darvin v. International Harvester Co., 610 F.Supp. 255 (S.D.N.Y. 1985) (class not certified where issues as to the plaintiff's credibility indicated he would not be an adequate representative); Cohen v. Laiti, 98 F.R.D. 581 (E.D.N.Y. 1983) (class not certified where plaintiff's inconsistent testimony demonstrated the plaintiff lacked credibility and would not be an adequate representative). The Class Members' testimony as to FFM's discipline of the Class Members, the morning meeting, hours of attendance, terms of employment and damages is inconsistent, contradictory and not credible. Since FFM is entitled to examine each Class Member at trial on these matters, the benefit of a class action is lost.

**A. FFM's Purported Required Hours of Attendance.** The Class Members testified to a wide disparity in their hours of attendance and what they believed those hours were. Several admitted that Fordham did not require set hours--others contended otherwise. There is no commonality between the stories of the class members. Moreover, FFM submitted affidavits from numerous FFM brokers that they were free to set their own hours. See fn 8.

**B. Discipline.** Testimony relating to purported disciplinary actions by FFM for arriving late to the office, leaving early and improper attire is inconsistent, contradictory and largely anecdotal between the opt-in class members. Speciale testified that he was never sent

home for arriving late to the morning meeting and never saw anyone sent home for arriving late. Suess Dec. Ex. V (Speciale Tr. I) at 67:15-68:3. Only a few questions later, Speciale reversed his testimony and stated that he did witness people being fined or sent home. Id. at 69:2-70:14. Speciale, however, did not remember their names. Id. at 69:6-11. Strangely, Speciale testified that if a broker left work early, Charles Giordano, Sr. would discipline him the following day by making him leave the office early, which is nonsensical. Id. at 69:15-20. Giordano Sr. denied Speciale's allegations entirely. Suess Dec. Ex. W (Giordano Sr. Dec.) at ¶ 4.

Griffith's purported knowledge of brokers being disciplined for leaving early and arriving late also is based on hearsay. Griffith admitted that he has no first-hand knowledge about any broker being fined. Suess Dec. Ex. Q (Griffith Tr. I) at 134:3-135:7. Griffith's testimony that Giordano Sr. and Baquet all levied the very same fines he has no first-hand knowledge of was denied by each. Baquet Dec. ¶ 24; Suess Dec. Ex. W (Giordano Sr. Dec.) at ¶ 4. This is consistent with Miller, who testified that he never saw anyone disciplined during his association with FFM. Suess Dec. Ex. T (Miller Tr.) at 73:10-13. When pressed, Griffith testified that no fines were actually issued against the brokers for leaving early; FFM only admonished the brokers. Suess Dec. Ex. Q (Griffith Tr. I) at 134:3-135:7. Griffith also admitted that there was no record on his commission runs of any fine imposed by Baquet for purportedly arriving late to the morning meeting. Id. at 83:20-87:8.

**C. The Morning Meeting.** Speciale and Griffith at their initial depositions both testified that there was a mandatory meeting each day at 8:30 a.m. Suess Dec. Ex. V (Speciale Tr. I) at 54:24-56:2; Ex. Q (Griffith Tr. I) at 98:3-6. Defendants submitted several declarations

disputing the Class Members' contention that the meeting was mandatory.[23] Griffith later changed his testimony that the mandatory meeting started at 8:00 a.m. Suess Dec. Ex. U (Griffith Tr. II) at 51:25-52:9. Adams and Miller also testified that the morning meeting started at 8:00 a.m., not 8:30 a.m. Suess Dec. Ex. N (Adams Tr.) at 61:1-24; Ex. T (Miller Tr.) at 30:20-23; 56:4-6; 79:18-80:3. Calabrese did not even mention a mandatory meeting, only that everyone was required to be in the office by 8:00 a.m. Suess Dec. Ex. P (Calabrese Tr.) at 59:5-22. Calabrese also admitted that Baquet did not run the meeting since he is not involved in such minute operations matters. Id. at 59:23-60:4.

**D. Sleeping in the Office.** Testimony that FFM required brokers to bring sleeping bags to the office to call overseas clients is similarly ridiculous and unsubstantiated. Suess Dec. Ex. Q (Griffith Tr. I) at 95:18-96:13. Giordano Sr. expressly denied Griffith's testimony as did several other supervisors, brokers and employees of FFM, including Jose Martinez whom Griffith contended slept in the office as well.[24] Conroy–Griffith's own partner–refuted such claims. Suess Dec. Ex. EE (Conroy Dec.) at ¶ 4. Even Calabrese testified that the sleeping bag issue was an "urban legend". Suess Dec. Ex. P (Calabrese Tr.) at 58:11-14. Speciale and Adams also admitted that they never heard or saw anyone bringing a sleeping bag to the office. Suess Dec. Ex. V (Speciale Tr. I) at 66:1-8; Ex. N (Adams Tr.) at 66:3-8. Phyllis Henderson, FFM's Chief Compliance Officer, hardly ever saw anyone at the office after 5:00 p.m. Henderson Dec. II ¶¶ 2-3.

---

[23] Baquet Dec. ¶¶ 5-7, 24; Suess Dec. Ex. X (Adams Dec.) at ¶ 4; Ex. BB (Gordon Dec.) at ¶ 4; Ex. CC (Hom Dec.) at ¶ 5; Ex. DD (Martinez Dec.) at ¶ 4; Ex. EE (Conroy Dec.) at ¶ 4; Ex. Y (Haddad Dec.) at ¶ 4; Ex. W (Giordano Sr. Dec.) at ¶ 4; Ex. Z (Giordano Jr. Dec.) at ¶ 5; Ex. AA (Spruill Dec.) at ¶ 5; Ex. FF (Tomasic Dec.) at ¶ 5; Ex. GG (E. Baquet Dec.) at ¶ 4; Ex. HH (Henderson Dec. I) at ¶ 5; Ex. II (Cawsey Dec.) at ¶ 4.

[24] Baquet Dec. ¶ 5; Suess Dec. Ex. W (Giordano Sr. Dec.) at ¶ 4; Ex. CC (Hom Dec.) at ¶ 9; Ex. AA (Spruill Dec.) at ¶ 5; Ex. HH (Henderson Dec. I) at ¶ 8; Ex. FF (Tomasic Dec.) at ¶ 8; Ex. Y (Haddad Dec.) at ¶ 4; Ex. DD (Martinez Dec.) at ¶ 4; Ex. EE (Conroy Dec.) at ¶ 4; Ex. Z (Giordano Jr. Dec.) at ¶ 8; Ex. X (R. Adams Dec.) at ¶ 4; Ex. GG (E. Baquet Dec.) at ¶ 5; Ex. II (Cawsey Dec.) at ¶ 4.

## VI. THE EMAIL RECORDS DEFINITIVELY ESTABLISH THAT THE OPT-IN MEMBERS DID NOT WORK OVERTIME OR FATALLY BELIES THEIR CREDIBILITY

The record of emails for each of the Opt-In members definitively establishes they did not work overtime hours. As detailed in the Declaration of Phyllis Henderson, a review was conducted of the first and last outgoing email from each of the 6 brokers to establish what time they started and ended work for approximately a two year period commencing February 2009. The emails make clear that at most Griffith, Speciale, Miller, Adams and Calabrese arrived before 9:00 a.m. or left after 6:00 p.m. on only a handful of occasions each (and not necessarily on the same day).

a. **Miller**. Miller worked at FFM as a licensed stock broker from March 13, 2008 through April 28, 2009. Emails from February 14, 2009 through April 28, 2009 confirm that Miller did not send a single email before 9:00 a.m. or after 6:00 p.m.

b. **Adams**. Adams worked at FFM as a licensed stock broker from October 13, 2010 through June 16, 2011. Emails from February 14, 2009 through June 16, 2011 confirm that he sent only one email after 6:00 p.m. and two emails before 9:00 a.m. The lone email after 6:00 p.m. was likely sent by the person in FFM's IT department who set up Adams' email account.

c. **Griffith**. Griffith worked at FFM as a licensed stock broker from January 15, 2008 through November 4, 2011. Emails from February 14, 2009 through November 4, 2011–a total of 993 days including weekends and holidays–confirm that Griffith sent a total of 31 emails either after 6:00 p.m. or before 9:00 a.m. This is one email after 6:00 p.m. and before 9:00 a.m. every 32 days, or less than once per month. However, of these 31 emails, 17 were not related to work or must otherwise be deducted from the total: 4 are duplicative; 7 are of a personal nature (such as making reservations, scheduling cable service call or picking up a suit); and 16 were

sent the same day, often within minutes of each other. This leaves 16 unique work related emails, which is one email every 62 days, or once every 2 months! In addition, 14 emails were sent from Griffith's iPhone, which suggests that he wasn't even in the office when they were sent.

   d.  **Speciale**.  Speciale worked at FFM as a licensed stock broker from March 18, 2003 through January 19, 2010.  Emails from February 14, 2009 through January 19, 2010 – a total of 339 days including weekends and holidays – confirm that Speciale sent a total of 36 emails either after 6:00 p.m. or before 9:00 a.m.  However, of these 36 emails, 17 were not related to work or must otherwise be deducted from the total: 2 were of a personal nature; 1 was a test; 7 were forwards to his assistant and colleagues; 2 were forwards to himself; and 16 were sent the same day, often within minutes of the other.  This leaves 19 unique work related emails, which works out to one email every 17 days.  In addition, 15 emails were sent from Speciale's iPhone, which suggests that he wasn't even in the office when they were sent.

## VII. THE OPT-IN PLAINTIFFS HAVE NOT ASSERTED ANY STATE LAW CLAIMS IN THEIR INDIVIDUAL CAPACITIES

   The NYLL claims should be barred as to the Opt-In plaintiffs. The consent forms filed by each of the Opt-In plaintiffs are extremely limited in scope. The document is entitled "CONSENT TO SUE UNDER THE FAIR LABOR STANDARDS ACT," and states that, "I hereby consent to be a party plaintiff in this lawsuit *in order to seek redress for violations of the Fair Labor Standards Act, pursuant to 29 U.S.C. § 216(b).*" Suess Dec. Exs. D-H (Consents to Sue) (emphasis added)]. There is nothing in the language of the opt-in plaintiffs' consent form which indicates that they intended to assert any pendent state-law labor claims in the event that the motion to certify a Rule 23 state-law class action was denied. Consent notices must be strictly construed according to their express terms. In a similar case, this Court held that where a consent to sue form stated that opt-in plaintiffs "consent to be a party plaintiff in a lawsuit . . . *in*

*order to seek redress from violation of the Fair Labor Standards Act, pursuant to 29 U.S.C. § 216(b),*" "there is no basis to conclude that the Opt-In Plaintiffs joined the named Plaintiffs in bringing claims under the [New York Labor Law]." Saleem v. Corporate Ground Transportation Group, Ltd., 12-CV-8450 (JMF), 2014 WL 7106442 (December 9, 2014)(emphasis original); see also Albritton v. Cagles, Inc., 508 F.3d 1012 (11th Cir. 2007)(where opt-in forms specifically stated that opt-in plaintiffs were "agreeing to pursue my claims in...the above-captioned lawsuit," opt-in plaintiffs could not be deemed to have consented to join a subsequent action brought after initial lawsuit was dismissed). Because the opt-in plaintiffs in this case did not consent to the assertion of any state-law claims on their behalf, any such claims purported to have been asserted on their behalf must be dismissed.

**Conclusion**

For the foregoing reasons, defendants respectfully request that the Court grant summary judgment dismissing plaintiff's complaint, decertifying the Collective Action, and for such further and other relief as it deems necessary and equitable.

Dated: New York, New York
July 13, 2015

SCHRADER & SCHOENBERG, LLP
Attorneys for Defendants

By:____________________________
David A. Schrader, Esq. (DS-1765)
711 Third Avenue, Suite 1803
New York, New York 10017
(212) 986-4888